

**SIGNED this 27 day of December, 2010.**

_____

**John C. Cook**
**UNITED STATES BANKRUPTCY JUDGE**

_____

## IN THE UNITED STATES BANKRUPTCY COURT FOR
## THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **Ronald Eugene Moses** | ) | **No. 09-17272** |
| **Patricia Jane Moses** | ) | **Chapter 7** |
| | ) | |
| **Debtors** | ) | |
| | ) | |
| | ) | |
| **Athens Federal Community Bank** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Adv. No. 10-1291** |
| | ) | |
| **Ronald Eugene Moses** | ) | |
| | ) | |
| **Defendant** | ) | |

## M E M O R A N D U M

This adversary proceeding is before the court on a complaint filed by Athens Federal Com-

munity Bank that seeks an order declaring nondischargeable certain debts owed to the bank by the

debtor and defendant, Ronald Eugene Moses.  Specifically, Athens Federal contends that these debts

-1-

were an extension of credit obtained by the defendant through the use of a false financial statement and that the debts should be declared nondischargeable under the provisions of § 523(a)(2)(B) of the Bankruptcy Code. Having considered the evidence presented at trial, together with the arguments of the parties, the court now makes its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in bankruptcy adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure. This is a core proceeding. 28 U.S.C. § 157(b)(2)(I).

## I.

During all times relevant to this proceeding, the defendant engaged in a car business and a construction business. His car business, known as RPM Classic Cars, was a sole proprietorship in which the defendant bought and sold classic and other used cars. The construction business, known as RPM Renovations, Inc., was a separate corporation in which the defendant performed construction and renovation work. Debtor Patricia Moses was president of that corporation, and the corporation's bankruptcy schedules reflect that she owns all the stock of the corporation.

On November 9, 2009, the debtors filed a joint petition for relief under chapter 7 of the Bankruptcy Code and, on that same date, RPM Renovations filed its own chapter 7 petition. At the time of the bankruptcy filings, the defendant owed Athens Federal substantial sums on several loans that the bank had made to him. Most of the loans were made by Richard Boyd, manager of the Decatur Pike branch of Athens Federal, and other loans were made by Shane Sewell, a loan officer at that branch.

Mr. Boyd and the defendant have been acquainted for over 20 years, and each has an interest in classic, vintage automobiles. During that time period, Mr. Boyd and the defendant had engaged

in a number of personal transactions involving the purchase and sale of mainly classic cars. Although not close personal friends, Mr. Boyd and the defendant have attended a few car shows together, and the defendant performed some construction work for Mr. Boyd over the years, including the building of Mr. Boyd's home.

Mr. Boyd has worked at Athens Federal for approximately 11 years. Some time in 2008, Mr. Boyd began making loans on behalf of Athens Federal to the defendant. In January 2008, the debtors provided a joint financial statement to Athens Federal. Attached to that joint financial statement were exhibits listing 11 real estate holdings and 34 cars, trucks, motorcycles, trailers, and other items owned by either or both of the debtors. Also included in the statement were a number of liabilities owed by the debtors. The financial statement did not specify whether the debtors owned the real estate or vehicles jointly or separately, nor did it indicate whether the liabilities were joint or separate liabilities. One of the properties listed in the real estate holdings was a property located at 127 Frye Street, with a stated value of $230,000 and a balance owed on a mortgage on the property in the amount of $32,000. The exhibit reflected that the ownership interest in the property was 50%, but there was no indication as to who held the 50% interests.

Although the January 2008 financial statement purported to be a joint financial statement of the debtors, only Patricia Moses signed the document. This financial statement consisted of a two-page preprinted form that had categories of information including a section for listing liabilities and a separate section for listing contingent liabilities. The statement reflected total liabilities of $2,869,122. No contingent liabilities were listed. Among other things, this financial statement represented that the debtors had accounts receivable totaling $484,000. A separate section of the financial statement required the listing of each account receivable along with the name of the "Maker/-

Debtor". The bulk of the accounts receivable were owed on what appears to be a $228,000 receivable from "Waypaca" and a $114,000 receivable relating to a "Spec House", with the remaining $142,000 classified as "Misc".

Some time prior to January 6, 2009, another financial statement was prepared for the defendant. This statement was prepared by Mr. Boyd, who testified that he began compiling information for the statement by taking information from the debtors' joint personal financial statement of January 29, 2008, and then including additional information found on a current credit report. Also, at some point, Patricia Moses provided to Athens Federal copies of lease agreements on the defendant's listed real estate so that Athens Federal could see the amount of lease payments being received on the properties. Unlike the 2008 financial statement, the January 2009 financial statement was not a preprinted form, but rather was a Microsoft Word document prepared by Mr. Boyd on his computer. He simply listed the defendant's assets in a column and the defendant's liabilities in another column. There was no separate section requesting the listing of contingent liabilities, nor was there a section requiring the listing of accounts receivable together with the "Maker/Debtor".

On January 6, 2009, the defendant came to Mr. Boyd's office to review the document. The financial statement referred to two exhibits prepared by Mr. Boyd on his computer that listed 14 real estate holdings and 52 cars, trucks, motorcycles, trailers, and other items owned by the defendant. After Mr. Boyd and the defendant reviewed the financial statement together, Mr. Boyd printed the updated statement and the defendant signed it. The signature affirmed that the defendant had provided "a complete listing of my assets and liabilities" as of January 6, 2009. According to the statement, the defendant had assets of just over $5 million and liabilities of $2.8 million, yielding a net worth of approximately $2.2 million. The liabilities included the loans that the defendant owed to

Athens Federal at that time in the amount of $421,197. Of that amount, the plaintiff introduced evidence of only one loan that Athens Federal had made to the defendant. Loan #378 was made on July 28, 2008, in the amount of $42,130.86, initially as an equipment loan, but later refinanced into a multi-vehicle loan. An outstanding balance of $27,735.92 remains on that loan. When Mr. Boyd was asked about the other indebtedness that the defendant owed to Athens Federal as reflected on the financial statement, he could not recall anything about it.

In late January 2009, Athens Federal, through Mr. Boyd, began selling the defendant real estate that Athens Federal had acquired through foreclosure. The defendant had previously informed Mr. Boyd that he was interested in purchasing foreclosed properties to fix up, lease, and then sell for profit. The defendant's purchases were financed by Athens Federal through Mr. Boyd, and the prices for the homes came from appraisals that Athens Federal had on file.

The bank loans were made on January 29, 2009 (Loan #71), February 4, 2009 (Loan #127), and March 17, 2009 (Loan #307). Also included in some of the loans were advances to fix up the properties. The loans were all secured by the real estate that was being sold to the defendant and, of course, Athens Federal, as the seller of the properties, received the proceeds of the loans to the extent of the sale prices. Mr. Boyd testified that Athens Federal expected the defendant to be able to make payments on the loans through income that he received from leases of the properties.

On March 30, 2009, the prior three loans were refinanced and rolled into a single master loan designated Loan #351. In all, the defendant purchased eight foreclosed properties from Athens Federal with the loan proceeds received from the bank. Of those eight properties, the defendant had obtained leases on six of the properties. The other two properties had homes that were unfinished at

the time of the sale. The defendant's outstanding liability on these loans totals approximately $306,474.27.

On February 5, 2009, approximately a month after the defendant signed the January 2009 financial statement, Athens Federal made Loan #130 and advanced funds to the defendant for the purchase of three cars from Mr. Boyd. The total amount of the loan was $115,000. Because of Mr. Boyd's personal involvement in the transaction, loan officer Shane Sewell handled the loan and Athens Federal's loan committee approved it. The loan was secured by the three cars. The principal balance remaining on the loan is $99,091.74.

On April 16, 2009, Athens Federal made Loan #439 to the defendant in the amount of $33,146.88. This two-month loan was repaid in full in on June 30, 2009.

On July 14, 2009, Athens Federal made Loan #837 to the defendant in the amount of $29,500 for the purchase of an automobile. Mr. Sewell handled this loan transaction and the collateral for the loan consisted of the purchased vehicle. The outstanding balance on this loan is $29,595.81.

Finally, on September 16, 2009, Athens Federal lent the defendant approximately $47,000 to remodel a building. This loan, Loan #132, made by Mr. Boyd, was secured by real property, and has an outstanding balance of $26,583.66.

Although the plaintiff did not introduce into evidence copies of the notes showing payment terms and due dates for the various loans, it did introduce printouts showing the loan history for each loan.

In October 2009, Athens Federal requested an update to the defendant's financial statement. Mr. Boyd testified that he again handled the update using the same procedures that he used in pre-paring the January 2009 financial statement, including relying on credit reports as well as the

defendant's own participation and input. The October 2009 statement is similar to the January 2009 statement. It lists assets of just under $5 million and liabilities of over $2.7 million, yielding a net worth of approximately $2.25 million.

Within a month of the preparation of the October 2009 financial statement, the debtors filed their joint petition for bankruptcy relief. Their bankruptcy schedules of assets and liabilities revealed that, jointly, the debtors had assets of $3,069,491.90 and liabilities of $3,978,971.62, resulting in a negative net worth of $909,479.72.

Athens Federal bases its nondischargeability complaint on several alleged false statements contained in the financial statements. They are (1) the inclusion of the Frye Street property as an asset, (2) the omission of a contingent liability owed to FSG Bank, (3) the inclusion of notes and accounts receivable in the amount of $472,000, (4) the omission of an IRS liability, (5) the omission of a property tax liability, (6) the omission of a liability owed to Hiawassee Builders Supply, (7) the omission of a liability owed to radio station WJSQ, (7) the omission of a liability owed to GE Money Bank, and (8) the understatement of a liability owed to Southeast Bank. The evidence with respect to each of these alleged false statements showed the following.

First, included in the list of the defendant's 14 real estate holdings was the Frye Street property that had been previously listed on an exhibit attached to the debtors' January 2008 financial statement. Unlike that statement, the January 2009 financial statement did not include any information about a percentage ownership in the property, but it did indicate that the property was generating lease income in the amount of $1,800, a representation not challenged at trial. The financial statement reflected that the liability to FSG Bank on the Frye Street property was still $32,000, but that debt was not listed as a liability on the face of the statement. Mr. Boyd testified that he did not

recall any discussion with the defendant about the Frye Street property or why a 50% ownership interest was reflected on the previous statement but not the January 2009 statement. He also failed to explain why the $32,000 debt to FSG Bank on the Frye Street property was not listed as a liability on the face of the January 2009 financial statement. The evidence revealed that the defendant did not hold an interest in the Frye Street property, but rather that Patricia Moses held a 50% ownership interest with the other 50% interest held by her stepmother. The total value of the defendant's equity in the real estate listed on the exhibit to the January 2009 financial statement was reported to be $1,459,782. Included in that amount is the reported equity in the Frye Street property, which totaled $198,000. Hence, the total equity in the real properties was overstated by approximately 13.6 % since the Frye Street property should not have been included as an asset belonging to the defendant.

Second, the January 2009 financial statement did not disclose a contingent liability that the debtors owed to FSG Bank. RPM Renovations, Inc., through its president, debtor Patricia Moses, had signed a note in favor of FSG Bank in the amount of $485,087.34, and the debtors had signed a personal guaranty of that note on April 24, 2007. The note was also secured by four commercial properties. The total value of the four commercial properties as reflected in the bankruptcy schedules of RPM Renovations was $242,500, and so, at the time of the filing of the bankruptcy petition, the corporate obligation was undersecured to the extent of $242,587.34. The proof did not reveal, however, the value of the collateral at the time of the January 2009 financial statement, or the defendant's opinion of the value at that time. Hence, it is unknown whether, or to what extent, the corporate obligation was undersecured in January 2009. The omission of the contingent liability from the January 2009 financial statement constituted a false statement.

Third, the January 2009 financial statement included an asset labeled "Notes and Accounts Receivable" valued at $472,000. Also, the October 2009 financial statement listed the same exact amount of "Notes and Accounts Receivable" that was listed in the January 2009 statement. No accounts receivable were disclosed on the debtors' bankruptcy schedule of personal property, nor were any disclosed in the schedules of RPM Renovations. There was no testimony about any discussions that Mr. Boyd may have had with the defendant regarding the accounts receivable, and there was no testimony about any discussions that Mr. Boyd may have had with the defendant about why the same figure of $472,000 appeared in both statements. Trial testimony failed to explain whether the accounts receivable belonged to the defendant or to RPM Renovations, or to what extent either had accounts receivable in January 2009, but the defendant did initially state in his deposition that he guessed the receivables belonged to RPM Renovations. He also stated in his deposition that he did not know to whom the receivables belonged. The court concludes that the defendant's representation in his personal financial statement that he had "Notes and Accounts Receivable" in the amount of $472,000 was false.

Fourth, the January 2009 financial statement did not list any IRS tax liabilities. According to the debtors' schedules, there were undisputed tax liabilities in the amount of $26,655.59 owing to the IRS from 2003. However, the debtors appear to have disputed the IRS tax debt at one time and it is not clear when it became "undisputed," especially since Mr. Boyd's testimony suggested that the debtors expected a tax refund based on a previous tax audit. Because the proof did not establish when the defendant became aware of the tax liabilities reflected in the schedules, the court does not find that the omission of the IRS tax debt from the January 2009 financial statement was a false statement knowingly made by the defendant.

Fifth, Athens Federal introduced a proof of claim showing that McMinn County was claiming that the debtors owed property taxes in the amount of $13,111.87, and Mr. Boyd was asked about the omission of that liability from the financial statement during his testimony. The defendant testified during his deposition that he did not know that he had any outstanding property tax liabilities at the time he signed the January 2009 financial statement. He also testified that, had he known about the property tax liabilities, he probably would not have disclosed them because he would not have thought about putting them on the financial statement.

A close examination of the McMinn County proof of claim and the attachments thereto show that, of the $13,111.87 claimed, no more than $3,245.00 were 2008 property taxes owed by the defendant. These taxes were due and payable from October 1, 2008, until February 28, 2009, without penalty. There was also an attachment to the proof of claim showing that the debtors owed a 2007 property tax obligation of $1,046.84. Unlike the other attachments to the proof of claim, which were duplicates of property tax notices containing the property addresses and the addresses of the property owner, this attachment did not reflect any property address, address of the property owner, or notice to the debtors. Because this attachment contained so little information about the 2007 property tax liability, and in the face of the defendant's testimony that he was unaware of any unpaid property tax obligations in January 2009, the court cannot infer from the contents of the document that the defendant in fact owed this obligation or that he received notice of it prior to January 2009.[1] The

---

[1] The attachment only refers to the property by parcel number. Two other duplicates of property tax notices for tax years 2008 and 2009 contain the same parcel number and list the property address as Congress Parkway. From an examination of these two other property tax notices, it appears that they were sent to the debtors at an address listed as 205 N. Hill Street, Athens, TN 37303. The lists accompanying the defendant's financial statements and the debtors' bankruptcy schedules do not disclose ownership of any property having the Congress Parkway address. Nor can the court
(continued...)

remaining balance of the proof of claim consisted of property taxes assessed after the January 2009

financial statement, or property taxes not owed by the defendant. The omission of the 2008 property

tax obligations in an amount of no more than $3,245 from the January 2009 financial statement was

a false statement.[2]

Sixth, the proof revealed that Hiawassee Builders Supply filed a proof of claim in the

debtors' bankruptcy case in the amount of $41,732.08, that radio station WJSQ filed a proof of claim

in the amount of $5,625.00, and that GE Money Bank filed a proof of claim in the amount of

$12,197.85. However, an examination of the proofs of claim reveals that the debts to Hiawassee

Builders Supply and WJSQ were owed by RPM Renovations and were not personal debts of the

debtors. Also, there was no evidence showing when the debt to GE Money Bank was incurred. Be-

cause the proof did not establish that the defendant individually owed these debts at the time the

January 2009 financial statement was signed, the court does not find that the omissions of these

liabilities were false statements.[3]

---

[1] (...continued)
find anything in the record suggesting that the Hill Street address was a valid address for the defen-
dant.

[2] The 2008 property tax liabilities may have been even less than $3,245. In comparing the
property addresses on the property tax notices with the list of properties accompanying the January
2008 and January 2009 financial statements, the court could only match three addresses, namely,
Decatur Pike 1400, Washington Avenue, and CO Rd 1120-100. The 2008 property taxes for those
three properties totaled $3,035.

[3] When Mr. Boyd was asked about unsecured debts that may have been owed, not by the
defendant but by RPM Renovations, he testified that he considered the defendant and the corporation
to be the same for purposes of obtaining financial information from the defendant. The financial
statements at issue here, however, were personal financial statements of the defendant and not finan-
cial statements of the corporation or consolidated financial statements. Thus, to the extent that cor-
porate debts were not included on the personal financial statements, those omissions would not be
false.

Seventh, Athens Federal complains that the liability to Southeast Bank was understated. Mr. Boyd testified that his review of the claims register in the debtors' individual case revealed liabilities totaling $1,326,417.90, although the court's addition results in a figure of $1,160,426.74. The January 2009 statement shows that the debt to Southeast Bank was $668,522 at that time. The evidence did not reveal what was owed to Southeast Bank at the time the January 2009 statement was signed. Between the time that financial statement was signed and the time the debtors' bankruptcy petition was filed, the debt to Southeast Bank could have increased significantly. Hence, the proof did not establish that the January 2009 financial statement was materially false with respect to the liability to Southeast Bank.

In summary, the January 2009 financial statement contained the following false statements: (1) the inclusion of the Frye Street property; (2) the inclusion of notes and accounts receivable in the amount of $472,000, (3) the omission of the contingent liability to FSG Bank, and (4) the omission of no more than $3,245 in property tax liabilities.[4]

The defendant admitted that he did not take the financial statements that seriously and he appeared to have very little knowledge about his financial affairs. He testified that he was not a "paper person" and that he did the construction work while his wife handled the bookkeeping for the businesses. The January 2009 financial statement was prepared by Mr. Boyd and given to the

---

[4] There is no question that the October 2009 financial statement was materially false. It listed the Frye Street property as an asset of the defendant's, it failed to list the guaranty issued in favor of FSG Bank on the debt owed by RPM Renovations, it listed "Notes and Accounts Receivable" in the amount of $472,000, it failed to list any debt to the IRS, it failed to list any property tax obligation, and it no doubt understated the liability to Southeast Bank since the liability was stated to be $327,000 just a few weeks before the debtors filed their bankruptcy petition. The evidence failed to establish, however, that the bank extended, renewed, or refinanced credit based on the October 2009 financial statement.

defendant to review during the course of one meeting. It does not appear that the defendant was given the financial statements ahead of time to review and return, and there was no testimony that the defendant was asked to or did bring any records or papers to the meeting to compare with the information on the financial statement and accompanying exhibits. Also, Mr. Boyd did not present any questionnaire or preprinted financial statement to be filled out by the defendant. When asked during his deposition whether he would have listed personal guaranties on the financial statement, the defendant responded "[t]he way we done this one, no." He further testified at his deposition that there was no discussion between him and Mr. Boyd about personal guaranties. Other than the leases, there was no mention of any other documents that the debtors submitted to the bank. Nevertheless, despite his limited knowledge about his financial affairs, the defendant signed the financial statements prepared for him by Mr. Boyd.

Athens Federal contends that it relied on the January 2009 financial statement in making the subsequent loans to the defendant. Mr. Boyd testified that, had he known that the defendant did not own the Frye Street property, that the defendant had no accounts receivable, or that the defendant had undisclosed liabilities, it would have affected his view of the defendant's creditworthiness. Lacking from Mr. Boyd's testimony, however, was an explicit statement that, had Athens Federal known the true state of affairs with respect to these false statements, the bank would not have made the subsequent loans to the defendant.

Ross Millsaps, the chief credit officer of Athens Federal responsible for overseeing the bank's loan portfolios, and Mr. Boyd's superior, testified somewhat differently about Athens Federal's reliance on the defendant's false statements. When asked during cross-examination about the falsity on which Athens Federal was relying, Mr. Millsaps responded that Athens Federal was only

-13-

relying on the "lack of all the liabilities." When asked again if that was the "only thing," he respond-ed, "Yeah, we're not questioning values, it's the liabilities that would have distorted his cash flow." Mr. Millsaps did not testify that the bank relied on the statement of accounts receivable in making the loans, nor he did he initially testify that the Frye Street property was a concern. It was only after the plaintiff's attorney asked Mr. Millsaps whether Athens Federal was also complaining about the inclusion of the Frye Street property on the financial statements that he answered affirmatively.

Mr. Boyd testified that he determined the defendant's ability to pay the loans by calculating the amount of lease payments the defendant was receiving from the real estate to see if it provided appropriate coverage for the required debt payments. He also  testified that, to the extent that the defendant had undisclosed liabilities, they could have affected the cash flow analysis.  Mr. Boyd was asked about the omission of debts to the IRS, Hiawassee Builders Supply, WJSQ, $5,625, and GE Money Bank and a purported understatement of debt to Southeast Bank, in addition to the omission of the contingent liability to FSG Bank and the property tax obligation. What Mr. Boyd's testimony did not reveal is whether the omission of the contingent liability and the relatively small property tax obligation, standing alone, would have made a difference in the cash flow analysis and the bank's decision to make the subsequent secured loans to the defendant.

With respect to the notes and accounts receivable listed in the January 2009 financial state-ment, the proof failed to reveal the extent of the omission of those receivables, although the court has concluded that the defendant did not personally own receivables in the amount of $472,000 at that time. If, however, Athens Federal was relying on the financial statement regarding the amount of notes and accounts receivable, it is puzzling that Mr. Boyd prepared the October 2009 financial statement listing the exact amount of receivables as the January 2009 statement and presumably did

not question the defendant about why there was no change in that figure. Also, Mr. Boyd was

familiar with the defendant's businesses and he knew that the construction business was a corpora-

tion. Mr. Boyd did not state whether he thought the accounts receivable were receivables of the cor-

poration or receivables belonging to the defendant personally as he simply assumed the defendant's

personal financial statement covered all of the assets and liabilities of the defendant and RPM

Renovations. If that was his assumption, and if he thought the reported receivables were corporate

receivables, then he must have known that corporate receivables would not be available to pay the

defendant's personal obligations. Instead, Mr. Boyd appears to have based his cash flow analysis,

not on the accounts receivable reported on the financial statement, but rather on the amount of lease

payments the defendant was receiving from his real properties. The court is not convinced that

Athens Federal relied on the false statement regarding the notes and accounts receivable in making

the loans to the defendant. This conclusion is buttressed by the testimony of Mr. Millsaps, who did

not mention the notes and accounts receivable as being a concern of Athens Federal.

      With respect to the inclusion of the Frye Street property on the January 2009 financial

statement, it appears that this property was carried over from the joint 2008 financial statement

where the debtors reported a 50% ownership interest in the property. This was an accurate statement

because Patricia Moses owned 50% of the property and her stepmother owned the other 50%

interest. When it came time to list the defendant's properties on the updated financial statement, it

is presumed that Mr. Boyd listed the properties reported in the 2008 statement in a new exhibit for

the defendant's review with regard to the January 2009 statement. In all, there were 14 properties

listed with an equity value of $1,459,782, which included the equity value of the Frye Street

property in the amount of $198,000. That property was listed without any designation of a percent-

-15-

age of ownership, and Mr. Boyd had no recollection of any discussion with the defendant about the property or the change from the 50% ownership interest to 100% ownership interest. Also, no explanation was given regarding the failure to list on the face of the January 2009 financial statement the $32,000 liability to FSG Bank on the Frye Street property that was reflected on the exhibit to the statement. One explanation was that the liability was owed by Patricia Moses and/or her step-mother and not by the defendant. It is also notable that the exhibit to the 2008 financial statement did not report any lease income from the Frye Street property but the exhibit to the 2009 January financial statement reflects that the defendant was receiving lease income from the property in the amount of $1,800 per month.

As previously noted, the loans made to the defendant in this case were all secured loans in which Athens Federal was either selling property to the defendant, financing a sale of cars from a bank loan officer to the defendant, or financing one other car purchase by the defendant. There was also one secured loan made to the defendant in September 2009 for the remodeling of a building. Based on the testimony of both Mr. Boyd and Mr. Millsaps, the defendant's ability to make payments on the loans through adequate cash flow from leases on the purchased properties appears to have been the primary concern of Athens Federal in making the loans to the defendant. The presence of the Frye Street property on the defendant's asset list does not impact his cash flow except to the extent that he reported that he was receiving $1,800 in income from that property, a fact not challenged during the trial. Also, the inclusion of that property on the exhibit attached to the January 2009 financial statement overstates the value of the equity in all the listed properties by only 13.6%. The proof does not convince the court that had the true state of affairs been known to Athens Federal, namely, that Patricia Moses was the actual owner of a 50% interest in the Frye Street property

rather than it being owned by the defendant, it would have had any impact on the bank's willingness to make the subsequent secured loans to the defendant. Again, Mr. Millsaps testified during cross-examination that Athens Federal was only relying on the "lack of all the liabilities" with regard to the defendant's financial statements and that Athens Federal was not concerned with values of assets stated in the financial statements. Mr. Millsaps's testimony on cross-examination was consistent with the notion that Athens Federal was only concerned with the defendant's cash flow as it related to his total liabilities, and the bank was not relying on the values assigned to the assets in the financial statements.

In total, the defendant's outstanding indebtedness to Athens Federal, incurred between January 6, 2009, and the petition date, amounts to $461,745.48. Inclusion of the July 2008 loan raises the defendant's outstanding indebtedness to $489,481.40.

One reason the defendant owes such a large deficiency to Athens Federal on the secured loans is that, after the debtors filed bankruptcy, it was discovered that Athens Federal had failed to file a UCC-1 financing statement on approximately eight or nine cars that served as the bank's collateral. Thus, Athens Federal does not have that collateral to offset the amount that the defendant owes. With respect to the loans secured by the real estate that Athens Federal sold the defendant, the evidence was somewhat inconsistent as to why such a large deficiency remains. Initially, Mr. Boyd testified that at least three of the properties remained unsold and that the defendant would get credit for the values of those properties once sold. However, later in the trial, Mr. Millsaps testified that the defendant had received credit for all of the real estate that served as collateral for the loans because Athens Federal has foreclosed on all of those properties through credit bids. Hence, it appears there were considerable differences between the prices of the properties that the bank sold

to the defendant and the amounts of the bank's credit bids when it retook the properties through foreclosure.

## II.

Athens Federal relies on § 523(a)(2)(B) of the Bankruptcy Code in seeking a declaration that the defendant's obligations to the bank are nondischargeable. That section provides, in relevant part:

A discharge . . . does not discharge an individual debtor from any debt –

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by –

(B) use of a statement in writing –

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

Succinctly stated, "[t]o satisfy § 523(a)(2)(B), the creditor must prove that the debt was obtained by the use of a statement (1) in writing; (2) that was materially false; (3) respecting the debtor's or an insider's financial condition; (4) on which the creditor to whom the debtor is liable for money, property, services or credit reasonably relied; [(5)] that the debtor caused to be made or published with intent to deceive." *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 780-81 (Bankr. E.D. Tenn. 2003) (citations omitted). The creditor seeking the nondischargeability determination must prove the elements of § 523(a) by a preponderance of the evidence. *Id.* at 759 (citing *Grogan v. Garner*, 498 U.S. 279 (1991)). "Additionally, § 523(a) is strictly construed against the creditor and liberally in favor of the debtor." *Id.*

-18-

The defendant's January 2009 financial statement was a statement in writing respecting the defendant's financial condition that was false. Specifically, the court has found that the financial statement was false because it included the Frye Street property as an asset, reported that the defendant had accounts receivable in the amount of $472,000, omitted the defendant's contingent liability on the guaranty obligation to FSG Bank, and omitted a property tax liability in the approximate amount of $3,245.

Next to be determined is whether the false statements were *materially* false. "Statements are materially false if they contain important or substantial untruths, and the 'size of the discrepancy is a key factor.'" *Regions Bank v. Whisnant (In re Whisnant)*, 411 B.R. 559, 565 (Bankr. E.D. Tenn. 2009) (quoting *Midwest Cmty. Fed. Credit Union v. Sharp (In re Sharp)*, 357 B.R. 760, 766 (Bankr. N.D. Ohio 2007)). A materially false statement "has been described as one that paints a substantially inaccurate picture of a debtor's financial condition by misrepresenting information of the type which normally would affect the decision to grant credit." *Sharp*, 357 B.R. at 765 (citations omitted). Here, the inclusion of the Frye Street property and accounts receivable in the amount of $450,000 and the omission of the guaranty obligation were materially false statements. However, the omission of the small property tax obligations in the amount of no more than $3,245 cannot be said to be a material omission because those obligations were not delinquent until February 28, 2009. Disclosure of that liability in the January 2009 financial statement would not have suggested any cash flow problems of the defendant since payment was not required until several weeks later.

The court now turns to the primary issue in this proceeding, namely, whether Athens Federal sustained its burden of proving that it reasonably relied on the false statements contained in the January 2009 financial statement. The creditor must prove that it actually relied on the false state-

-19-

ments in making the loans, and that its reliance was reasonable. *Nat'l City Bank v. Plechaty (In re Plechaty)*, 213 B.R. 119, 126 (B.A.P. 6th Cir. 1997). Actual reliance is a subjective test requiring that the lender prove that reliance on a false financial statement was a contributory cause of the extension of credit and that credit would not have been granted if the lender had received accurate information. *Frankford Bank v. Chryst (In re Chryst)*, 177 B.R. 486 (Bankr. E.D. Pa. 1994); *see, e.g.*, *Abrams v. Sea Palms Assocs., Ltd. (In re Abrams)*, 229 B.R. 784, 789 (B.A.P. 9th Cir. 1999) (creditor must demonstrate that false financial statements were a substantial factor in causing it to extend financing), *aff'd*, 242 F.3d 380 (9th Cir. 2000); *First Tenn. Bank Nat'l Ass'n v. Warner (In re Warner)*, 169 B.R. 144, 152 (Bankr. W.D. Tenn. 1994) (creditor must show that false financial statements constituted "a contributory cause of the extension of credit and that credit would not have been granted if the lender had received accurate information") (citations omitted).

As previously noted, all the loans made by Athens Federal to the defendant were secured loans. Moreover, most of the loans were made to finance the bank's sales of real estate to the defendant, and one loan was made to finance Mr. Boyd's personal sale of cars to the defendant, although the loan was handled by Mr. Sewell and approved by the bank's loan committee. These loans were not typical bank loans with the bank financing sales between a borrower and third parties. Rather, Athens Federal stood to gain from its sales of real estate to the defendant, and Mr. Boyd stood to gain from his sale of cars to the defendant. Such self-interest does not render the loans improper, but there is at least the appearance of an added incentive for the bank to have made these loans beyond the typical reasons a bank would make a loan to a borrower. Considering these circumstances, Athens Federal's proof of reliance on the false statements contained in the January 2009 financial statement was equivocal at best.

First, the proof simply did not establish that Athens Federal took into account the financial statement's inclusion of the Frye Street property and the accounts receivable in determining the defendant's qualification for the subsequent loans. As mentioned earlier, while Mr. Boyd did not testify in any detail about the manner in which Athens Federal determined the defendant's eligibility for the loans, he did state that he looked at the defendant's debt and the lease income and calculated whether the lease payments provided sufficient income to make the loan payments. There was no showing as to how knowledge of the true state of affairs regarding the Frye Street property and the accounts receivable would have changed the defendant's eligibility for the loans. Mr. Boyd testified that, had he known that the defendant did not own the Frye Street property or did not have accounts receivable, it would have affected his view of the defendant's creditworthiness, but he did not testify to what extent it would have affected his view. Left unanswered was whether his view of the defendant's creditworthiness would have been so affected that the bank would not have granted the loans. Moreover, Mr. Millsaps's testimony on cross-examination reinforces the court's finding that Athens Federal did not actually rely on the financial statement's inclusion of the Frye Street property and accounts receivable.[5]

---

[5] Even had Athens Federal proved that it relied on the defendant's statement regarding notes and accounts receivable, it did not prove that such reliance would be reasonable. Mr. Boyd was aware that the defendant's construction business was a corporation. He also assumed that the personal financial statement listed all the assets and liabilities of both the defendant and RPM Renovations. Mr. Boyd did not testify whether he believed the accounts receivable belonged to the defendant or to the corporation, and there was no testimony about any discussion between Mr. Boyd and the defendant concerning the source of these accounts receivable. It is difficult to believe that Mr. Boyd thought the defendant, rather than the corporation, possessed accounts receivable in the amount of $472,000. If Athens Federal were relying on the statement of accounts receivable, it should have at least clarified whether the accounts receivable belonged to the defendant or RPM Renovations. In the preprinted 2008 financial statement, the accounts receivable were required to be listed along with the names of the entities owing the receivables. Mr. Boyd did not solicit that information from the

(continued...)

Second, the proof failed to establish that, had Athens Federal known of the guaranty obliga-

tion and the property tax obligation left off the January 2009 financial statement,  it would not have

made the loans to the defendant. Both Mr. Boyd and Mr. Millsaps assumed that the defendant omit-

ted a number of  liabilities from his January 2009 statement including an IRS debt in the amount of

$26,655.59, property taxes in the amount of $13,111.87, the Hiawassee Builders Supply debt in the

amount of $41,732, the WJSQ debt in the amount of $5,625, the GE Money Bank debt in the amount

of $12,198, and the purported understatement of the Southeast Bank debt in the amount of approxi-

mately $668,000. At no time during the testimony of either Mr. Boyd or Mr. Millsaps did the

witness state that, had Athens Federal known the true state of affairs regarding the omitted liabilities,

the bank would not have made the subsequent loans to the defendant. Mr. Boyd essentially testified

that, had he known of the omitted liabilities, it would have affected his view of the defendant's

creditworthiness and would have impacted his assessment of the defendant's cash flow. Mr. Millsaps

testified that the omitted liabilities would have distorted the defendant's cash flow. A problem with

this testimony is that both witnesses were assuming that the January 2009 financial statement omit-

ted several liabilities that the court has found were not proven. Once these debts are excluded from

consideration, the only liability that was omitted from the financial statement was the contingent

liability on the corporate debt secured by four commercial properties and the small property tax

obligation.

With those exceptions, Athens Federal had a list of all the defendant's other liabilities total-

ing $2,819,060, a list of all his real estate and automobiles, recent credit reports on the defendant,

---

[5] (...continued)
defendant in connection with the updated 2009 financial statement that Mr. Boyd prepared as a word
processing document.

and leases showing the income the defendant was receiving from his real properties. Also, the January 2009 financial statement showed that the defendant had outstanding loans with Athens Federal in the amount of $421,197, which presumably were in good standing both at the time that financial statement was prepared and when the subsequent loans were made to the defendant. Based on all of the information possessed by the bank, it determined that the defendant qualified for the secured loans to him in 2009. Notably, at the time each of the loans was made, there was no request by Athens Federal that the defendant update his financial statement to show his current financial status. This suggests that the loans were made based primarily on the strength of the collateral and lease payments coming from that collateral, which the defendant could utilize to repay the loans.

It may well be that the defendant's relationship with Mr. Boyd, his payment history, the lease income, and the values of the various items of collateral were such that Athens Federal would have made the secured loans to the defendant even if the accounts receivable and the Frye Street property had been excluded from the financial statement and even if the contingent liability and the property tax obligation had been disclosed. There has simply been no showing that these false aspects of the financial statement were a "contributory cause" or a "substantial factor" in Athens Federal's decisions to make loans to the defendant. "While proof that the lender would not have made the loan[s] had the debtor provided accurate financial information is sufficient to show reliance, there was no such showing in this case." *First Nat'l Bank of Centerville, Tenn. v. Sansom (In re Sansom)*, 224 B.R. 49, 55 (Bankr. M.D. Tenn. 1998).

Although the court concludes that Athens Federal failed to sustain its burden of proof that it actually relied on the false information contained in the January 2009 financial statement, for the sake of completeness the court will address whether the proof established that the false statements

were made with intent to deceive. The defendant appears to have had little knowledge of his financial affairs at the time he signed the January 2009 financial statement. He admitted that he did not take that financial statement seriously, and he was, at the very least, grossly reckless in signing the financial statement that showed the Frye Street property as a personal asset and that included accounts receivable in the amount of $472,000. Recklessness in the face of extreme ignorance may rise to such a level as to create an inference of intent to deceive. *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 90 (6th Cir. 1993). The court does infer from the defendant's recklessness that he intended to deceive Athens Federal by affirmatively representing that he owned the Frye Street property and that he possessed accounts receivable in the amount of $472,000. The court, however, cannot make this same inference with respect to the omission of the contingent liability to FSG Bank. The preprinted financial statement that Athens Federal presented to Patricia Moses in January 2008 had one section for listing liabilities and another section for listing contingent liabilities. The January 2009 financial statement was simply a Microsoft Word document listing the defendant's assets and liabilities that was prepared by Mr. Boyd and presented to the defendant. The defendant did not appear to be sophisticated and knowledgeable regarding financial matters and, since he was not presented with a preprinted financial statement prompting him to list various types of assets and liabilities, it would seem that a prudent loan officer would know to question this borrower closely about the different types of assets and liabilities that should be included in a financial statement, including contingent liabilities. Here, the evidence did not reflect that such a discussion took place. The court believes that, under these circumstances, it is just as likely as not that the contingent liability was left off the financial statement through inadvertence or ignorance.

Hence, the court does not find that the defendant omitted the contingent liability from the January 2009 financial statement with intent to deceive Athens Federal.

### III.

For the foregoing reasons, the court finds and concludes that the plaintiff failed to carry its burden of proving that the defendant's debts to it are nondischargeable under 11 U.S.C. § 523(a)(2)(B). While the defendant's conduct is certainly worthy of reproach (particularly with respect to the grossly inaccurate October 2009 financial statement), the plaintiff's proof did not establish all of the elements that must be proved under § 523(a)(2)(B) in order to except the debts at issue from discharge. Accordingly, a judgment will be entered in favor of the defendant.

###